MARCENARO v. MORDELLA.

The husband cannot in virtue of the right with which he is invested by the common law in his wife's movable property, claim, after her death, her movables in course of administration in Louisiana, to the prejudice of those whose right thereto flow from our own statute of distribution.

It does not appear clear that, by the common law, the husband has a *vested* interest in the *choses in action* of his wife, not reduced to possession, during coverture, which would enable him to claim such interest, after her death, in a country where the policy of the common law was at all different.

APPEAL from the Second District Court of New Orleans, *Lea, J. Miles Taylor*, for plaintiff:

Personal property and debts are universally treated as having no situs, or locality, and they follow the domicil of the owner in point of right; that is to say, they are deemed to be in the place, and are disposed of by the law of the domicil of the owner, wherever in point of fact they may be situate. Story's Conflict of Laws, p. 299, No. 362; p. 308, No. 376; p. 311, No. 379; p. 312, No. 380. "It is a clear proposition," says Lord Loughborough, as quoted by Story, "not only of the law of England, but of every country in the world, where the law has the semblance of science, that personal property has no locality; it follows the law of the person. The owner in any country may dispose of his personal property; if he dies it is not the law of the country in which the property is, but the law of the country of which he was a subject, that will regulate the succession." The third paragraph of Art. 10 of our Civil Code, is a necessary consequence of the truth of this proposition, and may be regarded as a legislative recognition of it. The general principle is, that the law is obligatory upon all the inhabitants of a country indiscriminately; the foreigner, while residing in it, and his property within its limits, are subject to it. Art. 9 C. C. And for this reason immovable property cannot be disposed of by contract or by testament, in any manner not permitted by the law of the country where it is situated; no matter where the owner may reside, the property belongs to the country and is subject to its laws. It is otherwise with movables; they are attached, as it were, to the owner, and when he has his domicil in another country, although they exist here in point of fact, we expressly admit by the paragraph alluded to, that the owner is not, in the disposal of them by his last will, subject to the operation of our law. The same reason which exempts it from the operation of our law with respect to dispositions *causa mortis*, must subject it to the laws of the domicil of the owner, when they affect and determine rights. In the present instance, *Anna Barabino*, at the time the succession of *Joseph Barabino* was opened, was domiciliated at Gibralter, "a seaport town," as stated by *Bertoli*, in his petition making application for the curatorship of her succession, "belonging to Great Britain," where she intermarried with the plaintiff, who was also domiciled there, after the opening of the succession, and where she also died. Of course the questions arising in the controversy are to be decided by the law prevailing there, which is the common law.

It is a general rule of the common law that a married woman cannot possess personal property, and that everything of this kind to which she is entitled at the time of her marriage, and which accrues during its continuance, is vested solely in the husband. Clancy's Rights of Married Women, p. 1; 3 Coke, 309, note O.

Personal property, to which a woman may be entitled at the time of marriage, or during its continuance, consists of three kinds: 1st, personal chattels; 2d, *choses in action;* and 3d, chattels real; all of which the law vests in the husband. Clancy's Rights of Married Women, 2, 11, 12. There is a remarkable difference between personal chattels and the other two kinds of personal property. Personal chattels vest at once in the husband, in such a manner that they not only belong to him but they are actually in his possession. The other kinds are of such a nature that he has only the right of property in them, but no possession until the right has been enforced; and from this difference various consequences follow.

MARCENARO<br>v.<br>MORDELLA.

If the wife survives the husband, the personal chattels which she brought to him would be lost to her, but the *choses in action* and chattels real, which had not been reduced to possession by him in his life-time, would be taken by her. Clancy, p. 3; 3 Coke, 309, note O.

If the husband survive the wife, the *choses in action* and chattels real, as the right of property vests in him, may be recovered by him and reduced to possession; but he takes them subject to administration and as administrator. Clancy, 3, 4, and cases cited. 2 Kent, 135, 136; 3 Coke, 309, note O.

The only difference, in point of fact, between chattels personal and *choses in action*, is this: The husband is responsible for the debts of the wife, as husband, and if he is not sued for them during coverture, though he received a large estate by her, he is not bound after her death. If the personal estate were reduced to possession before her death, he would enjoy it, and not be compellable to pay her debts, though the property he then possessed, derived from her, far exceeded the debts. 2 Kent, 144, 145. What was not reduced to possession he would be entitled to, but only after administration in virtue of the right derived from her. So that it would be subject to the payment of her debts in the course of administration. 2 Kent, 135; 3 Coke, 309, note O. That is, he could not take the advantages resulting from his marriage, under such circumstances, without submitting to the burthens it imposed on him.

The surviving husband has the right to become administrator. 2 Jacob's Law Dict. 505, 512. But if he failed to administer, and her heirs administered, the right of property being vested in the husband, his title would not be affected, and he would be entitled to recover it from them. They would be regarded as trustees for the benefit of the husband, Clancy, 11, 12; 3 Thomas Coke, 305, 309, note O.; 2 Kent, 135; 7 Johnson Chan. Rep. 243; Johnson Rep. 117, 118. And in the event of his death his heirs would be entitled to recover.

*Roselius*, for defendant and appellant:

The question then presents itself, whether movable property in Louisiana is subject to the dominion of the common law of England, simply because the owner was domiciled and died in Gibraltar? This question involves an inquiry into the doctrine of real and personal statutes, about which so much has been written, and yet is so imperfectly understood.

A statute is real, when it mainly and essentially acts, or rather operates, upon the property itself; when the principal object it seeks to accomplish is with reference to things, and when it speaks of persons only incidentally and in relation to property; when it operates on persons only as a means, (if I may be permitted so to express myself,) to attain the final end which it proposes to itself with regard to property, for the purpose of regulating its division, transmission, &c.

A statute is personal, on the contrary, when its special and essential object is the person, that is to say, his general and absolute state and capacity; and when it refers to property only incidentally, as a means to accomplish the final end which it has in view with regard to the person, whose state and capacity is to be regulated and fixed; or, in other words, when it regulates directly and principally the general and absolute capacity of persons.

In the case of *Lea* v. *His Creditors*, 2 An. R. p. 603, Mr. Chief Justice Eustis, with his characteristic terseness and vigor, says: "A nation within whose territory personal property is found, has as entire jurisdiction over it while there as it has over immovable property. Its exercise for all purposes is a question of policy, and may be co-extensive with its authority over the latter. C. C., Art. 9; Story's Conflict of Laws, § 550; *Penny* v. *Christmas*, 7 Rob., 499; *Harper* v. *Stansborough*, 2 A. R., 377."

Real statutes are held to have no extra-territorial force or obligation. From this it would seem to follow that real statutes must necessarily operate on all the property located within the territorial limits of the State by which they have been enacted. But a fiction has been introduced, the purport of which is, that movable property has no *situs*—no locality; or in the quaint language of the schools, *mobilia ossibus personæ inhaerent;* and from this strange fiction the conclusion is drawn, that the rights to, and disposition of movables, is to be governed by the law of the domicil of the owner, and not by the law of their local situation.

That the weight of authority is in favor of the distinction here taken, as to

MARCENARO
v.
MORDELLA.

the effect of real statutes on immovable and movable property must be admitted; but that it is founded on any sound principle it would be difficult to establish. Can the laws of China or Persia exercise their dominion over property, whether movable or immovable, within the State of Louisiana? As has just been remarked, it is universally conceded, as a general principle, that, with the exception of personal statutes, no law can have an extra-territorial effect. On what legal ground then can it be pretended that movable property can be subject to the control of a foreign jurisdiction? Judge Story, after referring to the vague and unsatisfactory grounds on which this doctrine is sought to be supported by various authors, says: "the probability is, that the doctrine itself had not its origin in any distinction between real laws, or personal laws, or in any other fictitious annexation of them (the movables) to the person of the owner, or in their incapacity to have a fixed *situs*, but in an enlarged policy growing out of their transitory nature and the general convenience of nations." I must confess that this reason does not strike my mind as of a very convincing character. If the great facility of transportation of movable property from one State to another, is a sufficient ground to make its disposition subject to a foreign law, why may we not go a step farther, and establish the rule that the police or criminal law applicable to a stranger is that of his domicil, because of the rapidity of the transition of the individual from one place to another, especially in this age of steam speed!! The whole doctrine seems to have no other foundation than the contemptible quibble already referred to, that movables are attached to the bones of the owner, and are therefore subject to the operation of the personal statute which governs his person. However preposterous such a proposition may appear when stated in its true point of view, still it has received the sanction of nearly all the great jurists who have written on the science of jurisprudence. Among the foremost of its supporters are the great names of Story, Kent, Toullier and a host of others.

But of late years the rule has been subjected to the test of an independent scrutiny. In the case of *Smith, administrator*, v. *The Union Bank of Georgetown*, 5 Peters, 218, the question was much debated, whether the movable property, belonging to the succession of *Samuel Robertson*, should be distributed among his creditors, according to the *lex loci domicilii*; or the *lex rei sitae?* *Robertson*, at the time of his death, was domiciliated at Norfolk, in the State of Virginia, and the property was found in the District of Columbia. It was insisted that personal effects have no *situs*, and follow the person; and that this principle is founded on the law and practice of nations, &c. In delivering the opinion of the Supreme Court of the United States, Mr. Justice Johnson, says:

"That personal property has no *situs*, seems rather a metaphysical position than a practical and legal truth. We are now considering the subject with regard to subjecting such property to the payment of debts, through the medium of letters of administration. And here there is much reason for maintaining, that even the common law has given it a *situs*, by reference to any circumstances which mark its locality with discrimination and precision.

"Thus, in the case of *Byron* v. *Byron*, Hil. 38, Elizab. Cro. 472, Anderson, Chief Justice, says: "The debt is where the bond is, being upon a specialty, but debt upon contract follows the person of the debtor; and this difference has been often-times agreed." So Godolphin lays down the same distinction as established by law. Orphan's Legacy, 70. And Swinburn lays down the same rule with still greater precision, as well against the effect of domicil as of the place of contract. For he says: " debt shall be accounted goods, as to the granting of administration, where the bond was at his (creditor's) death, not where it was made." And, again: " debts due to the testator will make *bona notabilia* as well as goods in possession, but there is a difference between bonds and specialties, and debts due on simple contracts; for bond debts make *bona notabilia*, where the bond and other specialties, are at the time the of death of him whose they are, and not where he dwelt or died. But debts on simple contracts are *bona notabilia* in that country where the debtor dwells. Part. 6, Ch. 11. And so of judgments, locality is given them by the *situs* of the Court where they are entered. Carthew, 149; 3 Mod. 324; 1 Salk, 40; Dyer, 305; 1 Roll. Alr. 908; 1 Plow. 25; Charthew, 373; Comb, 392—are cited for these distinctions.

To my humble understanding the argument of Mr. Marcadé appears conclusive and unanswerable.

Mühlenbruch, in his *Doctrina Pandectarum*, is equally explicit in repudiating the distinction between movable and immovable property, in the application of the real statutes.

"De legum, quæ in diversis territoriis obtinent, conflictu.

"Jura, quæ proxime rebus sunt scripta, velut eaquæ ad dominii causam spectant, vel ad vectigalium tributorumque onus, vel ad pignorum in judicati exsecutionem et capiendorum et distrahendorum, tum etiam rerum apud judicem petendarum persequendarumve rationem, et quæ sunt reliqua ex hoc genere, estimantur ex ejus loci legibus, ubi res, de quibus agitur, sitæ sunt ac collocatæ, nullo rerum immobilium et mobilium habito discrimine."—Book T, sec. 72.

Mühlenbruch refers to Meier, Meissner, Tittmann, Eichhorn and Wachter, as supporting his view of the subject; but admits that the great majority of authors maintain the opposite doctrine.

Be this, however, as it may, it is admitted on all hands, that the extra-territorial operation of a foreign law, has no other foundation than the comity of nations, and that it is optional with every State to decide whether it will give effect to this comity or not. There can be no question then, that a foreign law can have no operation, when a Government has declared by a legislative enactment, that the property of foreigners (without distinguishing between movables and immovables) shall be subject to its laws.

MERRICK, C. J. A more complete statement of the facts of this case will be found in the learned opinion of Chief Justice *Slidell*, in the case of the plaintiff against *Nicholas Bertoli*, whose representative is now made a party to this suit. The case is reported in 2d An. R. 980.

For the purposes of the present decision, it is sufficient to recapitulate the following facts:

*Anna Bardino* had two children by her marriage with *Angel Mordella*. One, named *Marie Rose Mordella*, married *Nicholas Bertoli*, and resided with her husband, in this city. Her husband, *Bertoli*, having died in the year 1843, she was appointed, under his will, testamentary executrix and was also confirmed as tutrix to the children of their marriage. This suit is against her in those capacities.

It appears, also, that the other child of *Anna Bardino*, was named *Mina Isabella*, and resided at Gibralter, in Europe, with her mother.

It appears, also, that *Angel Mordella*, the first husband of *Anna Bardino*, died prior to May, 1834, and that she remained a widow up to July of that year, when she married *J. B. Marcenaro*, the plaintiff, both being domiciled at Gibralter, where they continued to live until she died, which occurred on the 24th of December, 1834. The petition informs us that Gibralter is still the domicil of the plaintiff.

Two months prior to the marriage of *Anna Mordella* with *Marcenaro*, (viz: in May, 1834,) *Joseph Bardino*, the german brother of *Anna Mordella*, having previously made a will, died in the city of New Orleans, where he was domiciled. By his will he bequeathed to his sister, *Anna Bardino*, $2000. A considerable portion of his estate remained undisposed of by will, and, consequently, by our law, fell to his sister and a half-brother, *Lorenzo Basso*, the german sister being entitled to three-fourths, and the half-brother the one-fourth ;— the succession consisting of real estate in New Orleans, slaves, active debts, &c.

No part of *Anna Bardino's* interest in her brother's succession was ever reduced to possession by *Marcenaro* during her life-time. It is, therefore, not necessary to notice, at length, the irregular proceedings under the power of attorney which was revoked by her death, or the decree of the Court of Probates, made in February, 1835, recognizing her and her brother, *Lorenzo Basso*, as the only heirs at law of *Joseph Bardino*, nor the irregular payment made by

*Nicholas Bertoli* and *John L. Thieleu,* as executors, to Messrs. *Lizardi & Co.,* in March, 1835, under the power of attorney, made before her death, of $4628 87 cash, and $4205 in promissory notes. This irregular decree and payment, could hardly have had the effect of transferring the interest of *Anna,* in the succession of her brother, to Messrs. *Lizardi & Co.,* as agents, not of herself, for she was dead, but of her heirs or husband.

We think, therefore, it must be admitted that at the time of the receipt of these assets by *Lizardi & Co.,* the interest of the succession of *Anna Bardino,* wife of *Marcenaro,* in the succession of her brother *Joseph,* remained un-extinguished. The assets in the hands of *Lizardi & Co.,* legally belonged to the succession of *Joseph Bardino,* as paid in error.

In 1836 *Nicholas Bertoli,* (who with *Thieleu* were the executors of *Joseph Bardino,* and responsible for these funds if irregularly paid,) took out letters of curatorship on the succession of his mother-in-law, *Anna Bardino,* the de-ceased wife of *Marcenaro.* An inventory of her succession was made, which embraced but two items, viz:

The real estate bequeathed by *Joseph Bardino* to his sister, subject
to the usufruct of *Palmire Berthier,* f. w. c., appraised at - - - $5000 00
And the balance remaining in the hands of *Lizardi & Co.* to the
credit of *Anna Marcenaro* - - - - - - - - - - - - - - - - - - -   2040 47
                                                                   ─────────
          Total - - - - - - - - - - - - - - - - - - - - - - - - - $7040 47

After *Bertoli's* appointment as curator he received from *M. de Lizardi & Co.,* in his capacity as such, the sum of $2498 95, stated as a balance growing out of the receipt of the cash and notes received by them in March, 1835. *Bertoli* also received of them the sum of $151 25, belonging to the succession of *Joseph Bardino,* and also notes and accounts of the same succession amount-ing together to the sum of $887 89.

*Bertoli* died in December, 1843, and as has already been stated, his wife a forced heir of *Anna Marcenaro,* was appointed tutrix to his minor children, and executrix under his last will and testament.

The suit of *Marcenaro* against *Bertoli* was instituted in 1840, in the Com-mercial Court, for the $2498 95 above referred to, and was dismissed as in case of nonsuit, by the Supreme Court, organized under the Constitution of 1812, and the decree afterwards affirmed by the court organized under the Constitu-tion of 1845, on a motion for a re-hearing.

The object of this suit is best explained in the language of the able counsel for the plaintiff, which is as follows:

"This suit is instituted for the recovery of $2498 95, claimed in the present action against *Bertoli,* and for three-fourths of the sum of $151 25, collected by *M. de Lizardi & Co.,* for the succession of *Joseph Bardino,* and paid to *Bertoli,* and for three-fourths of the accounts belonging to the succession of *Joseph Bardino,* and delivered at the same time to him, and the right to re-cover is based by the plaintiff upon the allegation 'that by the common law of England, he was entitled as surviving husband of the said *Anna Bardino,* to become administrator of her estate, and by acting upon the said fund of $2408 95, and upon three-fourths of the $151 25 collected by the said *M. de Lizardi & Co.,* for the succession of the said *Joseph Bardino,* and upon three-fourths of said accounts, amounting to $887 89, to reduce them to possession, and make them his own ; and that in the premises the said *Nicholas Bertoli,* in his capacity of the curator of the succession of the said *Anna Bardino,* peti-

tioner's deceased wife, as aforesaid, charged with the administration of the same, received the said sum of $2498 95, three-fourths of $151 25, three-fourths of the amount of said $887 89 of accounts which he collected or become accountable for by failing to use due dilligence to collect the same, and held as trustee of and for petitioner, and was bound in law to pay over the same to him.' "

The argument of the learned counsel for the plaintiff, who informs us that he sues for personal effects only, rests upon these two propositions:

1st. That the sums here claimed are movables, and *choses in action*, and the domicil thereof was that of *Anna Bardino*, at Gibralter.

2d. That by the act of marriage at Gibralter, all of the movable effects which the said *Anna* had in possession throughout the world, became *ipso facto* the property of her husband, and said marriage invested him with the right to reduce the *choses in action*, in all countries, into possession during coverture, and after her decease to take out letters of administration upon her estate, and collect such *choses in action* as had not been reduced to possession during the life-time of his wife, for his own benefit.

Many authorities have been cited in support of these propositions, and we think it cannot be questioned that by the common law of England the husband has the right indicated, over all the personal effects of the wife, and *choses in action* situated, *in fact*, within the territories governed by the common law of England. But we cannot assent to either of the above propositions as appropriate to interests in successions under administration in Louisiana, particularly where the effect would be to impair the legitime as in the case before us.

I. As to the domicil: At the death of *Anna Bardino*, as it has already been shown, she had an interest in the succession of her german brother, under administration, in the State of Louisiana, as heir for three-fourths of his estates, not disposed of by will, and as legatee under his will for $2,000.

Now although, under the Common Law of England, an interest as to the personalty under administration is considered as a *chose in action*, and classed as personalty, the same consequence does not follow here.

In England, personal effects alone are placed under administration, while the real estate descends at once to the heir, and cannot be charged in his hands with debts, except by specialty, etc. The personal effects are *distributed* to the next of kin. The real estate *descends* to the heir-at-law, who often inherits to the exclusion of others equally near in relationship to the ancestor.

Here, immovables, movables and slaves are alike placed under administration, and they are inherited by the same persons, and in the same proportions.

Article 463 of the Civil Code declares that an action for the recovery of an immovable, or an entire succession, is considered as an immovable from the object to which it applies.

It is clear, had an execution been levied upon the interest of three-fourths of Mrs. *Anna Bardino* in the movables belonging to the succession of *Joseph Bardino*, particularly describing them, and such interest were sold at Sheriff's sale, nothing would have passed by the sale. The interest of one of the heirs is not in a particular thing or class of things belonging to the succession, but to the whole succession; and that interest can be enforced as against the wishes of the other heirs only by partition of the whole estate, in which the respective rights. of all the heirs and their collations can be contradictorily settled with each other. Such was the right which belonged to *Anna Bardino* at her death. This.

98

MARCENARO
*v.*
MORDELLA.

right, whether it be considered a real right, or a *chose in action* of the Common Law, has its domicil, we think, in Louisiana.

The proceedings subsequent to the death of *Anna Bardino*, could not confer upon her husband any rights which he had not, upon her death. If he was not the owner or had not become the owner of her interest in her brother's estate at her death, he did not become so by the subsequent proceedings.

So far as it concerns the legacy of $2000, we do not deem it important to decide whether it is governed by the same rules or not, as it does not appear to be the object of this suit, and it is evident from the account rendered by M. *de Lizardi & Co.*, and the balance claimed on it by the plaintiff, that he has received more than that sum. 1 Marcadé, p. 56; C. C., 483.

II. Neither are we by any means clear that, by the Common Law, the husband has a *vested* interest in the *choses in action* of his wife not reduced to possession during coverture, which would enable him to claim such interest after her death, in a country where the policy of the law was at all different.

In a sister State, it was held that this inchoate right of the husband to the *choses in action* of his wife, not reduced to possession, was entirely defeated by the subsequent passage of an Act of the Legislature vesting in the wife, in her own name, her real and personal property. See Statutes of Mississippi as to the rights of married women, passed in 1839; the case of *Price* v. *Sessions*, 3 Howard's U. S. Rep., 624. See, also, the case of *Clark* v. *McCreevy*, 12 Sanders and Marshall's Rep., 317--352.

Now if, in a Common Law State, where the Legislature is pleased to change its policy, the courts refuse to enforce the imperfect rights of the surviving husband, who is one of her citizens, it can hardly be expected that the courts of a foreign country will do so where it is against the settled policy of that country, and defeats the rights of any of her citizens, particularly as to an interest so carefully guarded as that of the legitime. C. C., 1480, 1481, 1745, 1746.

We therefore conclude that there should be judgment for the defendant.

It is therefore ordered, adjudged and decreed by the court, that the judgment of the lower court be reversed, and that there be judgment in favor of the defendant in the several capacities in which she is sued, and against the plaintiff, and that the plaintiff pay the costs of both courts.